RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 25a0168p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

ADAM KANUSZEWSKI; ASHLEY KANUSZEWSKI; D.W.L., R.F.K., and C.K.K., minors; SHANNON LAPORTE; M.T.L. and E.M.O., minors; LYNNETTE WIEGAND; L.R.W., C.J.W., H.J.W., and M.L.W., minors,

                  *Plaintiffs-Appellees*,

    v.

MICHIGAN DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al.,

                  *Defendants*,

DR. SANDIP SHAH, in his official capacity; DR. SARAH LYON-CALLO, in her official capacity; MARY KLEYN, in her official capacity; MICHIGAN NEONATAL BIOBANK, INC., aka Michigan Neonatal Biorepository; ELIZABETH HERTEL, in her official capacity; CHRISTOPHER KRAUSE, in his official capacity,

                  *Defendants-Appellants*.

> No. 23-1733

───────────────

Appeal from the United States District Court for the Eastern District of Michigan at Bay City.
No. 1:18-cv-10472—Thomas L. Ludington, District Judge.

Argued:  March 20, 2025

Decided and Filed:  June 25, 2025

Before:  GRIFFIN, NALBANDIAN, and MATHIS, Circuit Judges.

───────────────

**COUNSEL**

**ARGUED:**  Jeremy C. Kennedy, PEAR, SPERLING, EGGAN & DANIELS, P.C., Ann Arbor, Michigan, for Appellants Krause and Michigan Neonatal BioBank.  Daniel J. Ping, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants Shah, Lyon-

Callo, Kleyn, and Hertel.  Philip L. Ellison, OUTSIDE LEGAL COUNSEL, PLC, Hemlock, Michigan, for Appellees.  **ON BRIEF:**  Jeremy C. Kennedy, PEAR, SPERLING, EGGAN & DANIELS, P.C., Ann Arbor, Michigan, Daniel J. Ping, Aaron W. Levin, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellants.  Philip L. Ellison, OUTSIDE LEGAL COUNSEL, PLC, Hemlock, Michigan, for Appellees.  Kimberly A. Jansen, Joshua G. Vincent, HINSHAW & CULBERTSON LLP, Chicago, Illinois, for Amici Curiae.

————————————

**OPINION**

————————————

GRIFFIN, Circuit Judge.

The State of Michigan collects blood samples from newborn babies and screens them for diseases as part of its newborn screening program.  This program is not unique.  Every state has one, and more than 98% of children born in the United States are tested at birth.  These programs are estimated to have saved thousands of infant lives across the country.

However laudable any government program may be, it must withstand the rigors of constitutional scrutiny.  Plaintiffs—four parents and their nine children who were born in Michigan and had their heels pricked and blood drawn as part of the newborn screening program—contend that Michigan's scheme entails coercive, non-consensual taking and keeping of baby blood for the state's profit, in violation of the Fourth and Fourteenth Amendments.

The district court initially dismissed plaintiffs' complaint, but a prior panel of our court reversed and remanded several claims.  *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 927 F.3d 396 (6th Cir. 2019) (*Kanuszewski I*).  Ultimately, the district court granted judgment in plaintiffs' favor on nearly all their remaining claims and ordered defendants to return or destroy plaintiffs' stored blood spots and data collected under the program.  Doing so was erroneous because the district court over-extended our prior opinion's holdings and failed to apply the law to the facts as developed during discovery.  We therefore reverse the district court's judgment in plaintiffs' favor on all Fourteenth and Fourth Amendment claims and vacate the injunction requiring defendants to destroy the stored data.

I.

A.

Michigan's newborn screening program began in 1965 to test infants for diseases and health disorders. *See* Mich. Comp. Laws § 333.5431(1). Michigan Department of Health and Human Services (MDHHS) oversees the program, requiring medical personnel to prick the heel of every newborn within hours of birth and collect five or six blood spots on filter paper known as a dried blood spot card. In addition to blood, the card also has demographic information about the baby and mother. MDHHS tests the blood spots for over 50 medical conditions, and every year it diagnoses more than 250 newborn Michigan babies with one of those rare disorders.

After the initial screening, MDHHS retained one blood spot at the laboratory for potential future use by the child or family—that is, until this litigation. Pursuant to a consent judgment MDHHS entered into with plaintiffs in this case, MDHHS stopped this practice and destroyed the stored blood spots. MDHHS has transferred and continues to transfer the remaining four or five blood spots to defendant Michigan Neonatal Biobank, a nonprofit corporation that stores the blood spot cards indefinitely in a temperature-controlled repository. The cards stored at the Biobank have no identifying information and are instead given a numeric code that corresponds to the demographic information kept by MDHHS in its electronic database. Only MDHHS has the information to identify the blood spots stored at the Biobank. Regulations permit MDHHS to store the blood spots for up to 100 years. Mich. Dep't of Health & Hum. Servs., Admin. Pol'y Facilities/Hosp. § 111 (2018). In practice, the Biobank intends to keep the blood spots for 100 years, MDHHS keeps the physical demographic card for 35 years, and MDHHS intends to keep the electronic demographic data indefinitely.

Through its Michigan BioTrust for Health program, MDHHS uses the blood spots after newborn screening for various purposes. These include: (1) validating the accuracy of its newborn screening tests, methods, and instruments; (2) permitting third parties to access the anonymized blood spots for medical and public health research; and (3) crime victim identification (if granted permission by a family member or pursuant to a warrant or subpoena).

None of the plaintiff-children's dried blood spots were used for any of these post-screening purposes.

Most concerning to plaintiffs, MDHHS does not obtain parental consent for the heel prick, newborn screening, or subsequent storage of the blood spots. *See* Mich. Comp. Laws § 333.5431(2), (7). Beginning in May 2010, MDHHS started asking for parental consent to use the blood spots for research, but still not for storage or any other use. Parents (including those who had children prior to May 2010) or the children themselves when they become adults may opt out of storage by submitting a form to the MDHHS lab requesting the return or destruction of the blood spots. Even if MDHHS destroys the blood spots upon request, it retains data about the child and the child's newborn screening results in its electronic database.

B.

This court's prior opinion sets forth the claims at issue. *Kanuszewski I*, 927 F.3d at 404–05. There, we "disaggregate[d] Plaintiffs' claims and the forms of relief sought" to determine which plaintiffs (the parents or the children) had standing to pursue which forms of relief (monetary, declaratory, or injunctive) against which defendants (MDHHS, the Biobank, MDHHS employees, or the Biobank employee). *Id.* at 406. We summarized the claims as falling under two constitutional guarantees: (1) Fourteenth Amendment substantive-due-process violations of both the "*children's* right to refuse medical treatment" and the "*parents'* own fundamental liberty interest in the care, custody and management of their children"; and (2) a violation of "the *children's* Fourth Amendment rights." *Id.* at 406–07. Regarding harm, we noted that they challenged "the *completed* collection of the children's blood samples, as well as the *ongoing* storage of the samples and the risk of the *future* use of the samples by third parties." *Id.* at 407.

After the district court's dismissal of these claims at the pleading stage, we affirmed the dismissal of all claims against MDHHS, the Biobank, and the individual defendant-employees sued in their official capacities based on state sovereign immunity. *Id.* at 425. We also affirmed the dismissal of claims seeking damages against the defendant-employees in their individual capacities based on qualified immunity. *Id.* To be clear, those dismissals included claims related

to the heel prick and initial screening of the newborns' blood, which are no longer at issue. But we reversed the district court's dismissal of plaintiffs' Fourth and Fourteenth Amendment claims for injunctive and declaratory relief concerning post-screening retention and use of the blood spots and data. *Id.* at 421–22, 425.

On remand, the parties cross-moved for summary judgment. At first, the district court granted partial summary judgment in each party's favor. *Kanuszewski v. Shah*, 551 F. Supp. 3d 747, 775–77 (E.D. Mich. 2021) (*Kanuszewski II*). Concerning the Fourteenth Amendment claims, the district court held that use of the dried blood spots for research did not violate plaintiff-parents' due-process rights for the parents who consented to research. *Id.* at 765. But, the court held, genuine issues of material fact precluded summary judgment on the claims that storage of the blood spots violated plaintiff-parents' due-process rights. *Id.* As for the Fourth Amendment claims, the court found triable issues of fact underpinning the data-retention claims, but it dismissed the blood-spot-retention claims as to the plaintiff-parents who consented. *Id.* at 775.

As referenced above, the parties then stipulated to a partial consent judgment concerning the single blood spot that MDHHS kept for future parental use. Defendants agreed to destroy all blood spots stored for potential parental use (for all parents uninvolved in this litigation) and return the blood spots stored for plaintiff-parents' use. They also agreed to stop retaining blood spots for parent use going forward. Therefore, this conduct—defendants' storage of a single blood spot for parental use—is not at issue in this appeal.

The parties cross-moved for reconsideration of the district court's summary judgment order and the district court revised its holdings as to the remaining substantive-due-process claims. It held: (1) defendants failed to obtain informed consent to retain or conduct research based on the blood spots; and (2) defendants' use and retention of the blood spots does not satisfy strict scrutiny. *Kanuszewski v. Shah*, 627 F. Supp. 3d 832, 849–52 (E.D. Mich. 2022) (*Kanuszewski III*); *Kanuszewski v. Shah*, 636 F. Supp. 3d 781, 786–87 (E.D. Mich. 2022) (*Kanuszewski IV*). Accordingly, the district court expanded its grant of summary judgment in

plaintiffs' favor as to nearly all the Fourteenth Amendment claims and allowed only the Fourth Amendment claims to go to trial.

The district court then conducted a five-day bench trial on those claims and held that defendants' storage of the blood spots and associated data violated the Fourth Amendment. *Kanuszewski v. Mich. Dep't of Health & Hum. Servs.*, 684 F. Supp. 3d 637, 659 (E.D. Mich. 2023) (*Kanuszewski V*) (bench trial opinion). The court therefore entered judgment on the Fourteenth and Fourth Amendment claims in largely plaintiffs' favor and issued an injunction requiring defendants to mail a notice to each plaintiff-parent, who could then request the return or destruction of their infant's blood spots and data or provide informed consent for ongoing retention and research of the spots and data. *Id.* at 660. The parties stipulated to a partial stay of the injunction pending appeal, wherein defendants agreed to return or destroy all blood spots but not to destroy the associated data. Defendants complied with the injunction by mailing the notices and returning the blood spots. Per the stipulation, defendants have not yet destroyed the data.

## II.

We first address a jurisdictional matter that plaintiffs continue to challenge despite a motion panel's ruling: mootness. If events occur during the case that make it "impossible for the court to grant any effectual relief whatever to a prevailing party," we must dismiss the appeal as moot. *Fialka-Feldman v. Oakland Univ. Bd. of Trs.*, 639 F.3d 711, 713 (6th Cir. 2011) (citation omitted); *accord Constangy, Brooks & Smith ex rel. Teledyne Indus., Inc. v. NLRB*, 851 F.2d 839, 841–42 (6th Cir. 1988).

Plaintiffs previously argued that the appeal is partially moot and thus moved to dismiss the appellate claims involving the blood spots because defendants returned the blood spots to plaintiff-parents pending this appeal, leaving only the data-retention claims. Our prior panel denied that motion, reasoning that although "Defendants can no longer obtain the return of the blood samples," "they can obtain a review of the constitutionality of their retention and use." Therefore, the panel explained, "our judgment will have a concrete and meaningful effect on the

ongoing operation of the Newborn Screening Program and the future invocation of qualified immunity by state employees involved in the program."

Undeterred, plaintiffs' briefing still advances their mootness position. But what we said is still true. Our appellate review is not limited to the injunction, which the parties admittedly effectuated during this appeal's pendency. The district court entered judgment in plaintiffs' favor in an opinion that will be binding on the parties unless reviewed by our court. Although we cannot order plaintiffs to return the blood spots that they destroyed per the injunction, the underlying constitutional challenges are not moot on appeal because we can still affirm or reverse the district court's judgment.

III.

Plaintiffs raise another threshold matter, one that pertains to the merits of this appeal. They contend that we are bound by the law-of-the-case doctrine, which precludes reconsideration of issues that our court decided explicitly or implicitly "by necessary inference" at an earlier stage of the case. *McKenzie v. BellSouth Telecomms., Inc.*, 219 F.3d 508, 512–13 n.3 (6th Cir. 2000) (quotation omitted). The law-of-the-case doctrine is "not an inexorable command." *Hanover Ins. Co. v. Am. Eng'g Co.*, 105 F.3d 306, 312 (6th Cir. 1997) (citation modified). A holding on a motion-to-dismiss appeal does not typically establish the law of the case at the summary judgment stage, "when the complaint has been supplemented by discovery," because our motion-to-dismiss analysis assumes that the plaintiff's factual allegations are true. *McKenzie*, 219 F.3d at 513; *see also Taylor v. City of Saginaw*, 11 F.4th 483, 487 n.1 (6th Cir. 2021).

*Kanuszewski I* held that plaintiffs' claims—(1) that defendants' indefinite storage and potential uses of the blood spots violated the parents' Fourteenth Amendment substantive due process right to direct the medical care of their children, and (2) that this conduct constituted an unreasonable seizure under the Fourth Amendment—survived a motion to dismiss because they were adequately pleaded in the complaint. 927 F.3d at 421–22, 425. Plaintiffs now argue that because they proved most of the facts of their complaint through discovery, we need not revisit

our legal conclusions and should instead hold, as did the district court, that *Kanuszewski I* dictates judgment in their favor.

We cannot agree. In *Kanuszewski I*, we appropriately assumed that the complaint's allegations regarding medical treatment, searches, and seizures were true. But we neither "considered" nor "consciously resolved" whether each of defendants' discrete actions following the taking of the plaintiff-children's blood actually constituted medical care under the Fourteenth Amendment or a search or seizure under the Fourth Amendment. *See United States v. Obi*, 132 F.4th 388, 396 (6th Cir. 2025) (declining to apply a prior opinion's legal reasoning as the law of the case because the language reflected the prior panel "deciding one issue" while "merely opining about another" (citation modified)); *cf. Wright v. Spaulding*, 939 F.3d 695, 702 (6th Cir. 2019) (noting that questions that "merely lurk in the record" and were not ruled upon do not constitute binding precedent (citation omitted)).

As explained in the following sections, judgment in plaintiffs' favor requires a detailed look at how each challenged action fits into the Fourteenth and Fourth Amendment frameworks, not the broad-sweeping assumptions and the accompanying "snowballing consequences" we made at the motion-to-dismiss stage. *Wright*, 939 F.3d at 701. In other words, the conclusory legal statements from *Kanuszewski I* do not establish binding law of the case; thus, we must perform an in-depth, de novo analysis of defendants' actions to determine whether they violate plaintiffs' constitutional rights. To that we turn next.

IV.

*Fourteenth Amendment*. Because the district court resolved all Fourteenth Amendment claims on summary judgment, *see Kanuszewski II*, 551 F. Supp. 3d at 775–76; *Kanuszewski III*, 627 F. Supp. 3d at 851; *Kanuszewski IV*, 636 F. Supp. 3d at 789–90, our review is de novo, *Snyder v. Finley & Co., L.P.A.*, 37 F.4th 384, 387 (6th Cir. 2022). Summary judgment is appropriate if, "viewing the evidence and drawing all reasonable inferences in the light most favorable to the nonmoving party," there is "no genuine issue as to any material fact" and "the movant is entitled to judgment as a matter of law." *CMACO Auto. Sys., Inc. v. Wanxiang Am. Corp.*, 589 F.3d 235, 241–42 (6th Cir. 2009) (citations omitted). A "genuine issue" exists "only

when there is sufficient evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 242 (internal quotation marks omitted).

## A.

The Fourteenth Amendment provides that "[n]o State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. One component of "due process of law" is substantive due process, which "bar[s] certain government actions regardless of the fairness of the procedures used to implement them." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). It "specially protects those fundamental rights and liberties which are, objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksberg*, 521 U.S. 702, 720–21 (1997) (citation modified). The liberty interests secured by the Due Process Clause include the right "generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men." *Ingraham v. Wright*, 430 U.S. 651, 673 (1977) (citation modified).

The Supreme Court has held that these common law privileges include the right to bodily integrity, *Rochin v. California*, 342 U.S. 165, 172 (1952), to direct the education and upbringing of one's children, *Meyer v. Nebraska*, 262 U.S. 390, 402–03 (1923), and to refuse unwanted lifesaving medical treatment, *Cruzan ex rel. Cruzan v. Dir. Mo. Dep't of Health*, 497 U.S. 261, 278, 286 (1990). Derived from these common law privileges, parents' liberty interest "in the care, custody, and control of their children" "is perhaps the oldest of the fundamental liberty interests recognized by [the Supreme] Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion).

The Supreme Court "has always been reluctant to expand the concept of substantive due process because guideposts for responsible decisionmaking in this unchartered area are scarce and open-ended." *Collins v. City of Harker Heights*, 503 U.S. 115, 125 (1992). "By extending constitutional protection to an asserted right or liberty interest, we, to a great extent, place the matter outside the arena of public debate and legislative action." *Glucksberg*, 521 U.S. at 720. "We must therefore exercise the utmost care whenever we are asked to break new ground in this

field, lest the liberty protected by the Due Process Clause be subtly transformed into the policy preferences of the Members of this Court." *Id.* (citation modified).

Substantive due process "is not a rigid conception, nor does it offer recourse for every wrongful action taken by the government." *EJS Props., LLC v. City of Toledo*, 698 F.3d 845, 862 (6th Cir. 2012). Accordingly, to identify an unenumerated right, we must first carefully describe the asserted fundamental liberty interest. *Glucksberg*, 521 U.S. at 721. Plaintiffs bear the burden to put forth this careful description. *See Seegmiller v. LaVerkin City*, 528 F.3d 762, 769 (10th Cir. 2008) (glossing *Chavez v. Martinez*, 538 U.S. 760, 775–76 (2003) (plurality opinion)). Second, we must examine whether the asserted liberty interest is "objectively, deeply rooted in this Nation's history and tradition." *Glucksberg*, 521 U.S. at 720–21; *Ingraham*, 430 U.S. at 673–74.

## B.

First, we must carefully define the fundamental right at issue. *See id.* Defendants do not contest that parents have a fundamental right to direct the medical care of their children. Nor could they, for that principle is well-supported by caselaw. *Kanuszewski I*, 927 F.3d at 418–19 (detailing the Supreme Court precedent underpinning a parent's right to direct his child's medical care). Rather, defendants insist that their actions do not implicate that right. That is, they insist that their conduct does not involve medical care of plaintiffs' children because "it wrests no control from a parent," and "does not seek to draw any conclusions about anyone." Although defendants concede that the initial heel prick and screening were "'medical' in nature," they argue that the post-screening conduct that is at issue in this appeal is not medical because it does not implicate plaintiffs' bodily integrity.

On remand, the district court found that "Defendants do in fact retain the [blood spots], transfer the samples to the BioBank, and indefinitely store the samples for use by the state and third party research." *Kanuszewski II*, 551 F. Supp. 3d at 761. Relying on our prior opinion, the court concluded that "Defendants interfered with Plaintiff-parents' fundamental right to direct the medical care of their children, as defined by the Sixth Circuit." *Id.* But, as explained above,

our prior opinion did not analyze whether each challenged action constituted medical care. And the district court failed to do so on remand.

We must now determine, in the first instance, whether defendants' actions that are at issue in this appeal—storing anonymized blood spots and using them for purposes beyond the child's medical diagnosis or treatment—impede plaintiff-parents' fundamental right to direct the medical care of their children. As set forth, they do not.

1.

The Supreme Court has "never specifically defined the scope of a parent's right to direct her child's medical care." *Kanuszewski I*, 927 F.3d at 418 (quoting *PJ ex rel. Jensen v. Wagner*, 603 F.3d 1182, 1197 (10th Cir. 2010)). We know that the Court "based the protected liberty interest in refusing medical treatment" on "the traditional rights of bodily integrity and against unwanted touching," *Capen v. Saginaw County.*, 103 F.4th 457, 464 (6th Cir. 2024), but not on a right to privacy, *see Cruzan*, 497 U.S. at 279 n.7 ("Although many state courts have held that a right to refuse [medical] treatment is encompassed by a generalized constitutional right of privacy, we have never so held.").

On one hand, courts have recognized certain state conduct that unmistakably constitutes medical care and therefore implicates a liberty interest. *See Cruzan*, 497 U.S. at 286 (refusing parents' request to take vegetative child off life support); *Vitek v. Jones*, 445 U.S. 480, 494 (1980) (involuntary psychiatric treatment for a prisoner); *Jacobson v. Massachusetts*, 197 U.S. 11, 26–27 (1905) (mandating vaccination); *L.W. ex rel. Williams v. Skrmetti*, 73 F.4th 408, 418 (6th Cir. 2023) (banning sex-organ surgeries and puberty blockers for minors with gender dysphoria); *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1203–04 (10th Cir. 2003) (performing physical examinations and blood tests on children) *cf. Parham v. J.R.*, 442 U.S. 584, 604 (1979) (procedural due process challenge to law permitting parents to institutionalize children in mental health facilities). Beyond the traditional medical-care context, courts have also recognized substantive-due-process claims in countless cases involving government intrusions (both legislative and executive) on one's right to bodily integrity, which "usually arise in the context of government-imposed punishment or physical restraint." *Kallstrom v. City of Columbus*, 136

F.3d 1055, 1062 (6th Cir. 1998); *see also Guertin v. Michigan*, 912 F.3d 907, 920–21, 920 n.4 (6th Cir. 2019) (collecting "numerous cases involving government experiments on unknowing and unwilling patients" wherein the government "[i]nvoluntarily subject[ed] nonconsenting individuals to foreign substances with no known therapeutic value").

On the other hand, there are state actions that plainly do not implicate medical care or bodily integrity. For example, we previously held that the Affordable Care Act's individual mandate to obtain health insurance did not threaten plaintiffs' liberty interest in directing their own medical care because they are free to choose their medical provider and medical treatment. *U.S. Citizens Ass'n v. Sebelius*, 705 F.3d 588, 601 (6th Cir. 2013). Although the mandate broadly concerned healthcare, we held that individuals do not have a fundamental "freedom to remain uninsured or a freedom to refuse to pay for unwanted medical care." *Id.* Purchasing health insurance does not affect bodily integrity or medical treatment in a direct sense and is therefore not protected by the Fourteenth Amendment.

Our recent decision in *Capen*—where we held that a state's mandatory psychological fitness-for-duty evaluations did not violate an employee's right to refuse unwanted medical treatment—is particularly illustrative. 103 F.4th at 463–64. We upheld the state's rule because the employee "was not forced to accept any treatment" and because "the purpose of the evaluations appeared to be descriptive," seeking only "to collect information from [the employee] and render a conclusion based on that information, rather than order him to make particular treatment decisions." *Id.* Although the psychologist recommended that the employee seek further mental health treatment, counseling (beyond the evaluation) was not a condition of employment. *Id.* at 464. We therefore concluded that the employee was "not forced to seek what we would commonly understand to be treatment." *Id.*; *see also Foote v. Ludlow Sch. Comm.*, 128 F.4th 336, 350 (1st Cir. 2025) (per curiam) (rejecting a substantive-due-process claim anchored in using a student's desired pronouns because the challenged conduct did not "involve[] intrusions upon the bodily integrity of the child or other conduct with clinical significance—whether through a medical procedure, examination, or hospitalization").

2.

With these precedents in mind, we hold that plaintiffs have failed to show that defendants' conduct at issue—retention and use of the dried blood spots and data—implicates the parents' right to direct the control of their children's medical care.[1]

Consider first defendants' storage of the dried blood spots and data. Under no reading of the caselaw can one argue that the literal act of storing involves medical treatment, diagnosis, or advice, or that this act intrudes on bodily integrity. Nor do the other uses—quality assurance, test improvement, test development, research, and victim identification—constitute medical care for the child who provided the blood spots. While they may "help[] to ensure accurate and timely screening for other babies," plaintiffs concede that "general public health research is not directly connected to the specific care of the peculiar newborn Michigan children." In fact, the consent form signed by some plaintiff-parents affirms: "Most likely you or your child will not benefit from blood spot research." And plaintiff-parents do not have a fundamental right to direct the medical care of *other* children. In sum, plaintiffs failed to prove that any of these actions touch on their decision-making with respect to their children's medical care.[2] *See Capen*, 103 F.4th at 463–64.

Although plaintiff-parents strongly oppose defendants' storage and research of their children's blood spots and data, we cannot elevate every concern to a "fundamental right." An alleged fundamental right must be "objectively, deeply rooted in this Nation's history and tradition, and implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Glucksberg*, 521 U.S. at 720–21 (citation modified). Plaintiffs alleged in their complaint violations of such a right—the right to direct the medical care of one's

---

[1]Privacy concerns lurk behind plaintiffs' Fourteenth Amendment arguments. They, for example, take issue with the exposure of the data to medical personnel throughout the state. But privacy is a distinct liberty interest, and one that plaintiffs did not plead.

[2]Only one potential use for the dried blood spots arguably constituted "medical care" of the plaintiff-children: MDHHS's retention of one blood spot at its lab for future use by the parent or child, such as for future disease diagnosis. This purpose required plaintiff-parents' medical decision-making. But as explained above, the parties stipulated to a consent judgment in plaintiffs' favor as to claims related to storage of the cards kept for parental use, so this conduct is not at issue in this appeal.

child—which is why the complaint survived a motion to dismiss. *See Kanuszewski I*, 927 F.3d at 418. But as discovery evidenced and as illustrated above, defendants' actions do not intrude on that right. The actual proposed "right" at issue here—the freedom to refuse to have one's child's blood spots anonymized, stored, and used for purposes wholly unrelated to the child's medical care—has not been recognized by any court and is, at best, tenuously related to plaintiff-parents' liberty interests in protecting their children's bodily integrity insofar as the dried blood spots are (or were at some point) part of the body. Such extrapolation is too abstract to constitute an objective, historically rooted fundamental right. Nor do defendants' actions infringe any other well-established fundamental right of parents to direct their child's upbringing, education, care, custody, or control. *Glucksberg*, 521 U.S. at 720; *Troxel*, 530 U.S. at 72.

With no fundamental right infringed, our analysis ends here. We therefore reverse the district court's order granting summary judgment in plaintiffs' favor and hold that defendants' storage and use of the dried blood spots and data do not violate plaintiff-parents' Fourteenth Amendment substantive-due-process rights. We remand for entry of judgment consistent with this opinion.

V.

*Fourth Amendment*. We next address whether defendants violated plaintiff-children's Fourth Amendment rights by storing and using the blood spots and data without consent. Following a bench trial, the district court found that they did. *See Kanuszewski V*, 684 F. Supp. 3d at 655. "[W]e review the district court's factual findings for clear error and its conclusions of law de novo." *Foster v. Nationwide Mut. Ins.*, 710 F.3d 640, 643–44 (6th Cir. 2013).

A.

The Fourth Amendment protects against unreasonable searches and seizures. U.S. Const. amend. IV. To determine whether a Fourth Amendment violation occurred, courts must first ask whether the alleged government conduct constitutes a search or seizure. *See Taylor v. City of Saginaw*, 922 F.3d 328, 332 (6th Cir. 2019). "Different interests are implicated by a seizure than by a search." *Segura v. United States*, 468 U.S. 796, 806 (1984) (plurality opinion). "A seizure affects only the person's possessory interests; a search affects a person's privacy interests." *Id.*

In granting judgment in plaintiffs' favor, the district court conflated these distinct concepts, focused solely on plaintiffs' alleged privacy interests, and concluded that all of defendants' conduct fell under the Fourth Amendment.[3]　As explained below, this was erroneous.　We therefore consider anew whether each challenged action—dried blood spot storage; data storage; and use of the dried blood spot for research, equipment calibration, test improvements, and victim identification—was an unreasonable search or a seizure under the Fourth Amendment.

B.

A search occurs "when a government official invades an area in which 'a person has a constitutionally protected reasonable expectation of privacy,'" or when a government official "trespasses upon a constitutionally protected area." *Taylor*, 922 F.3d at 332 (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967) (Harlan, J., concurring), and citing *United States v. Jones*, 565 U.S. 400, 404–05 (2012)).　It requires "an attempt to find something or to obtain information." *Jones*, 565 U.S. at 408 n.5.　Under the Supreme Court's *Katz* approach, we ask first whether the individual has an actual, subjective expectation of privacy; second, whether that expectation is one that society is prepared to recognize as reasonable. *Taylor*, 922 F.3d at 332 (citing *Katz*, 389 U.S. at 361 (Harlan, J., concurring)).

The Supreme Court has held that testing a blood sample, after the sample is collected, invades an individual's privacy interests. *Skinner v. Ry. Lab. Execs. Ass'n*, 489 U.S. 602, 616 (1989); *cf. Chandler v. Miller*, 520 U.S. 305, 313 (1997) (noting that "government-ordered collection and testing of urine" are "searches under the Fourth Amendment" (citation modified)).

Even so, much of defendants' conduct is not a search because it is not "an attempt to find something or to obtain information." *Jones*, 565 U.S. at 408 n.5; *see also Skinner*, 489 U.S. at 616 (analyzing a person's blood sample "*to obtain physiological data*" about the person was a

---

[3]The district court stated that our prior search holding—"conducting chemical analysis on blood samples invades the subject's privacy interests," *Kanuszewski I*, 927 F.3d at 410—"is controlling," *Kanuszewski V*, 684 F. Supp. 3d at 648.　But that holding is not the law of the case.　Moreover, although that part of our prior holding was correct, it is inapposite because defendants' conduct at issue does not involve the initial blood testing.　We never held that defendants' post-screening uses for the blood spots invaded parents' privacy interests.

search (emphasis added)).  For instance, defendants' uses of the stored blood spots for equipment calibration and improving screening program tests are not searches because they do not reveal any information about the individual plaintiff-children.  Likewise, defendants' transfer of the blood spots to private third parties are not searches.  Those transfers, without research, do not reveal any information to the government.

True, in some circumstances when the government encourages and endorses blood or urine testing by third parties, such testing can be attributed to the government.  *See Skinner*, 489 U.S. at 615–16.  And there is evidence that the state encourages third-party research of blood spots, given Michigan's statutory authorization of research, Mich. Comp. Laws § 333.5431(7)(b), and MDHHS's strong support for the BioTrust program.  But here, the third-party researchers do not obtain private information about individual plaintiff-children because all blood spots are anonymized.  Indeed, similar claims about anonymized information have been litigated in several of our sister circuits, and none of those courts have recognized a privacy interest in information revealed to third parties that is not personally identifiable.  *See Harper v. Werfel*, 118 F.4th 100, 110 (1st Cir. 2024) (no reasonable expectation of privacy under the Fourth Amendment in pseudonymous cryptocurrency transactions); *cf. In re Nickelodeon Consumer Priv. Litig.*, 827 F.3d 262, 281–90 (3d Cir. 2016) (no violation of Video Privacy Protection Act when internet-service provider provided anonymous static digital identifiers to third parties because such information was not "personally identifiable" under the Act, even though the information could theoretically be traced back to an individual); *In re Zynga Priv. Litig.*, 750 F.3d 1098, 1107–08 (9th Cir. 2014) (no violation of Electronic Communications Privacy Act when social networks disclosed confidential user information to third parties, even though the third parties could theoretically use the information to identify the user).

Plaintiffs' remaining search claim concerning defendants' use of the blood spots for victim identification is not justiciable.  Defendants never used, or even attempted to use, plaintiff-children's blood spots for victim identification.  This fact, alone, is dispositive—the Fourth Amendment protects against actuality not potentiality.  *See United States v. Karo*, 468 U.S. 705, 712 (1984).  Moreover, even if defendants sought to use a plaintiff-child's blood spots for victim identification, defendants would do so only if a family member consents or if the

police obtain a warrant or subpoena.  A claim that is "dependent on contingent future events that may not occur as anticipated, or indeed may not occur at all, . . . is not constitutionally ripe." *Carman v. Yellen*, 112 F.4th 386, 400 (6th Cir. 2024) (citation modified).  Because defendants' policy has not caused any injury in fact to plaintiffs—one that is "concrete and particularized" and "actual or imminent," *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (citation modified)—plaintiffs lack constitutional ripeness and standing to bring this claim, *see Carman*, 112 F.4th at 405 (explaining that constitutional ripeness "encompass[es] traditional parts of the standing inquiry:  namely, whether a plaintiff is threatened with imminent injury in fact" (citation modified)).

We therefore reverse the district court's entry of judgment in plaintiffs' favor on the Fourth Amendment claims.

## C.

That leaves us with one remaining challenged action—defendants' retention of dried blood spots and data.  We analyze that retention as a potential seizure, not as a search, because it involves MDHHS's exercise of "dominion and control over" the dried blood spots and data.  *Cf. United States v. Miller*, 982 F.3d 412, 434 (6th Cir. 2020) (quoting *United States v. Jacobsen*, 466 U.S. 109, 120 (1984)).

A Fourth Amendment seizure of property occurs "when there is some meaningful interference with an individual's possessory interests" in the property seized.  *F.P. Dev., LLC v. Charter Twp. of Canton*, 16 F.4th 198, 208 (6th Cir. 2021) (citation modified).  To prevail on a Fourth Amendment claim for unreasonable seizure, plaintiffs must prove that (1) they had a possessory interest in the property, (2) the government meaningfully interfered with that possessory interest, and (3) that interference was unreasonable.  *See Jacobsen*, 466 U.S. at 113; *see also Brown v. Battle Creek Police Dep't*, 844 F.3d 556, 566 (6th Cir. 2016); *Bey v. Sessler*, 2024 WL 2078564, at *4 (6th Cir. Feb. 29, 2024) (order).  Plaintiffs stumble on the first element—they fail to prove that they had a possessory interest in the blood spots and data.

Possessory interests are created and defined by state law.  *Albrecht v. Treon*, 617 F.3d 890, 894 (6th Cir. 2010) (explaining that the state defines property interests and federal law

No. 23-1733         *Kanuszewski, et al. v. Mich. Dep't of*         Page 18

*Health & Hum. Servs.*

decides whether the property interest "rises to the level of a constitutionally protected property interest" (internal quotation marks omitted)); *see, e.g.*, *Smith v. City of Detroit*, 751 F. App'x 691, 694 (6th Cir. 2018) (looking to Michigan law to determine a property interest in connection with a Fourth Amendment seizure claim). In resolving this issue, the district court equivocated. It first hypothesized that Michigan statutes governing the program "reflect[] a legislative determination" not to grant a child or parent a property interest in the child's blood spots "because MDHHS is authorized to develop a retention and disposal schedule for" the dried blood spots without parental consent. *Kanuszewski II*, 551 F. Supp. 3d at 771 (citation modified). But it also reasoned, "MDHHS permits parents to request destruction of the [blood spots]" and now "requires parental consent for [blood spots] to be used for research." *Id.* Thus, even though "Michigan law does not explicitly provide for parental decision-making in the process, MDHHS, acting through its statutory authorization, appears to have acknowledged at least a limited property interest in the [blood spots]." *Id.* Ultimately, the district court relied on our prior opinion, stating that we "ha[d] already answered the . . . question." *Kanuszewski V*, 684 F. Supp. 3d at 645 (citing *Kanuszewski I*, 927 F.3d at 425). But as set forth, our prior opinion assumed without deciding that plaintiffs had a possessory interest sufficient to establish a Fourth Amendment seizure claim.

Michigan courts have only obliquely discussed whether individuals have a possessory interest in their blood spots or associated data. In reference to evidence about blood alcohol content, the Michigan Court of Appeals once mentioned that a criminal defendant "voluntarily surrendered *her possessory interest in the blood sample*" such that "there is no basis on which defendant can object to the seizure of her blood." *People v. Woodard*, 909 N.W.2d 299, 305 (Mich. Ct. App. 2017) (emphasis added). But the blood sample there—drawn consensually in connection to the defendant's drunk-driving arrest—differs from the dried blood spot cards that MDHHS collects from newborns pursuant to the newborn screening program and from the demographic data that MDHHS digitally stores.

Neither we nor the district court on remand need to resolve this important state-law question concerning possessory rights because plaintiffs failed to prove their claim. At no point, in their complaint, in briefs before the district court, or on appeal, did plaintiffs support that they

have a property interest in the dried blood spots and data, let alone satisfy their burden of proof. Plaintiffs assumed without offering a single case, statute, or argument that they have a property interest in the blood spots and data—an essential component of a seizure claim. Because they did not prove a property interest, we reverse the district court's judgment in plaintiffs' favor as to the Fourth Amendment seizure claims.

## VI.

For these reasons, we reverse the district court's grant of summary judgment in plaintiffs' favor on the Fourteenth Amendment claims, reverse the entry of judgment in plaintiffs' favor on the Fourth Amendment claims, and vacate the injunction requiring defendants to destroy the stored data.